**So Ordered.**

**Dated: March 2nd, 2026**



Frederick P. Corbit
Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 25-00577-FPC13 |
| NATHAN LEWIS and SARAH LEWIS, | |
| Debtors. | |
| TAMARA BAUGHN, | Adv. No. 25-80026-FPC |
| Plaintiff, | |
| v. | |
| NATHAN LEWIS, SARAH LEWIS, and FARMHOUSE LEGACY CO., LLC, | |
| Defendants. | |
| JON MORRISON and OREI PARKER, | Adv. No. 25-80025-FPC |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER RE: NON-DISCHARGEABILITY CLAIMS** |
| NATHAN LEWIS, SARAH LEWIS, and FARMHOUSE LEGACY CO., LLC, | |
| Defendants. | |

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 1

# I.    INTRODUCTION

This case arises from misrepresentations made by Debtor Nathan Lewis to certain creditors who entrusted him with substantial deposits to build and renovate their homes. Mr. Lewis misrepresented to these creditors that he would provide licensed and competent construction services to induce the creditors to give him substantial cash deposits. However, he used their deposits on other people's projects and to fund his struggling business, instead of using the money on those creditors' projects.

After several failed building projects, Mr. Lewis and his wife, Sarah Lewis (collectively, the "Debtors"), filed for chapter 13 bankruptcy. Jon Morrison and Orei Parker (collectively, "Morrison and Parker"), and Tamara Baughn, filed proofs of claim in the bankruptcy case. Morrison and Parker and Ms. Baughn also filed adversary proceedings, in which they request the Court declare the debts owed to them are non-dischargeable under 11 U.S.C. § 523.

The Debtors' primary defense is that liability for the incomplete projects and missing cash rests solely with Farmhouse Legacy, Co., LLC ("Farmhouse Legacy"), a limited liability company that Mr. Lewis used in connection with his construction business. However, credible evidence establishes that Mr. Lewis used Farmhouse Legacy's corporate form to shield personal misconduct and to obtain money by false representations.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 2

The Court concludes that Farmhouse Legacy's corporate form should be disregarded. Moreover, the Court concludes that Mr. Lewis violated Washington's Consumer Protection Act, warranting the imposition of personal liability. As a result, the debts Mr. Lewis owes to Ms. Baughn, and Morrison and Parker, are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). However, no basis exists to impose liability on Mrs. Lewis's separate estate.

The Court enters this memorandum opinion and order in both adversary proceedings. Contemporaneously with this order, the Court will enter judgments in each adversary proceeding detailing the precise amounts of each nondischargeable debt.

## II. <u>MEMORANDUM ORDER</u>

The Debtors are a married couple. In December of 2018, Mr. Lewis formed Farmhouse Legacy, LLC.[1] (ECF[2] No. 1, p. 41) Farmhouse Legacy was established in connection with Mr. Lewis's construction business. Mrs. Lewis had no involvement in the financial affairs, business management, or day-to-day operation of Farmhouse Legacy. Mrs. Lewis testified that the only reason she was named as a member of the LLC was so that she could have access to business records in case Mr. Lewis died or could not otherwise access the records.

---

[1] The Unified Business Identifier for Farmhouse Legacy is 604 216 567, and the Employer Identification Number for Farmhouse Legacy is 84-2371773.
[2] For clarity, all "ECF" references refer to the docket in Main Case No. 25-00577-FPC13.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 3

*The Baughn Project*

Sometime in August of 2021, Ms. Baughn met with Mr. Lewis and one of his employees to discuss a potential construction project. Mr. Lewis presented to Ms. Baughn a project proposal on Farmhouse Legacy's letterhead. The proposal provided for various renovations on Ms. Baughn's home over the course of approximately twelve to sixteen weeks, starting "Mid November 2021." The project proposal estimated the project cost at $162,150 and stated "[a]bove all else, we will leave you with a home transformation built to elite standards, high quality and integrity."

Although the Baughn project proposal never led to a signed contract, by early October 2021, Ms. Baughn was contemplating making a downpayment and formally committing to the project. In an email communication with Mr. Lewis, Ms. Baughn expressed she had the cashier's check in hand, but she was "freaking out a little bit." Mr. Lewis replied hours later, stating:

> I totally understand the difficulty in making large changes that cost list [sic] of money. Thank you for trusting us and allowing us to work with you in this project.
> Also, we are licensed, bonded and insured for more then [sic] the state requires.

On or about October 22, 2021, Ms. Baughn delivered a check of $81,075.00 payable to Farmhouse Legacy, which served as her initial deposit for the project.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 4

Ms. Baughn was told that her deposit was used for purchasing an HVAC unit, building materials and permitting fees.

In early November of 2021, Mr. Lewis told Ms. Baughn he was seeking a permit from Spokane County for the project. Mr. Lewis obtained a permit on April 1, 2022, which included approval for plumbing work. However, Mr. Lewis is not, and never has been, a licensed plumber. Nor did Farmhouse Legacy employ a licensed plumber for the Baughn project. Mark Connolley, a construction compliance inspector from the Washington State Department of Labor & Industries ("Department of L&I"), testified that Spokane County improperly permitted plumbing work for Ms. Baughn's property.

Notwithstanding his lack of a license to perform plumbing work, Mr. Lewis undertook plumbing work on Ms. Baughn's home. Ms. Baughn was unaware that the plumbing work was performed by an unlicensed contractor. The plumbing work was a critical and significant part of the construction project.[3]

Shortly after Mr. Lewis received the Baughn permit from Spokane County, Mr. Lewis told Ms. Baughn that he needed additional funds to continue the project. On May 21, 2022, Ms. Baughn tendered a second deposit of $27,025 to Farmhouse Legacy. She paid a third deposit of $27,025 on June 25, 2022.

---

[3] Specifically, plumbing work was to include "all labor and materials" to "[a]dd plumbing for the new bathroom upstairs," extend "the kitchens downstairs," "[w]ork in the bathroom as needed," and "[w]ork on the septic as needed."

By August 2022, Ms. Baughn began noticing serious issues and significant defects with the project. For example, her home flooded from a leak in the roof, despite prior assurances that the roof was completed months earlier.

In April of 2023, Ms. Baughn received a "Job Progress Report" which contained an invoice for $36,994.01. The Job Progress Report stated that $90,243.83 was spent on materials and $21,364.33 on "overhead." However, Ms. Baughn questioned whether $90,243.83 was spent on materials, and she testified that she could not determine what expenses were encompassed within the claimed "overhead" costs. Nonetheless, out of a desire get the construction project completed, Ms. Baughn paid the invoice. In total, Ms. Baughn paid $172,119.01— despite being promised that the project's total cost would only be $162,150.

By September 2023—almost two years after the initial deposit—Ms. Baughn realized her project was not progressing towards completion, the construction was faulty, and Mr. Lewis had not used her money for expenses related to her house as he had promised. Mr. Lewis informed Ms. Baughn that his business was experiencing "a lot of shifting internally" and he had to terminate two employees. Sometime in August or September of 2023, Ms. Baughn filed a complaint related to the project with the Department of L&I.

On September 19, 2023, Mr. Lewis gave Ms. Baughn another "Job Progress Report," which requested an additional payment of $35,000. Ms. Baughn refused

to pay the invoice, due to the lack of progress, and because costs had already far exceeded the original estimate set forth in the proposal.

On December 15, 2023, Mr. Connolley, of the Department of L&I, visited Ms. Baughn's property and investigated the construction work. Mr. Connolley noticed a plethora of issues, particularly with the plumbing, piping, and structural integrity of the construction work. Mr. Connolley testified that although Spokane County had sent an inspector to approve the plumbing work at Ms. Baughn's property, he believed the inspector did not actually conduct a proper inspection.[4]

In total, the Department of L&I issued three infractions against Mr. Lewis personally regarding Ms. Baughn's property: (i) $500 for "failure to provide the customer with a disclosure statement as required and/or produce a signed copy of the disclosure statement to the Department upon request," under RCW 18.27.114; (ii) $500 for "advertising, offering to work, submitting a bid, or performing any plumbing work without being licensed as a contractor," under RCW 18.106.400(1); and (iii) $500 for "employing a person to engage in the trade of plumbing without a current journeyman, specialty, or trainee certificate, temporary permit, or medical

---

[4] The Court heard conflicting testimony regarding the extent of Spokane County's inspection of the plumbing work. Mr. Connolley testified that, in January 2024, he met with the Spokane County inspectors who had approved the plumbing work and was informed that the inspectors never left their vehicle and did not actually inspect Ms. Baughn's property. Mr. Lewis testified that an inspector did appear at the property and conducted a proper inspection. Regardless, Mr. Connolley's investigation resulted in citations related to the plumbing work performed, which Mr. Lewis never appealed.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 7

gas endorsement," as required by RCW 18.106.020.[5] Mr. Lewis never appealed or contested the infractions.

On November 1, 2023 Ms. Baughn terminated her relationship with Mr. Lewis via text message.

On November 2, 2023, Mr. Lewis replied to Ms. Baughn's text message, stating:

> Hi Tammi,
> I am in [sic] very saddened as well as disappointed in my self [sic] and my company for not being able to deliver you the product we originally discussed. There have been several factors and a laundry list of excuses along the way. The bottom line is I have failed you and I apologize for that. I completely understand your wanting to move on and I dont [sic] deserve the grace you have shown thus far. Thank you for being the kind person that you have and giving me a chance to try and save my company through its many failures.

Ms. Baughn testified that Mr. Lewis subsequently came to her property unannounced. During his visit, Mr. Lewis removed materials, including the HVAC system, that he had previously said were purchased with Ms. Baughn's money.

By December 2023, Mr. Lewis's business was facing severe financial problems. At trial, Mr. Lewis failed to provide credible, clear testimony revealing the exact expenditure of Ms. Baughn's funds, or an explanation of the "overhead" costs and value of the materials purchased for Ms. Baughn's project. However, the

---

[5] Mr. Connolley testified that the Department of L&I issued the infractions against Mr. Lewis personally because there was no licensed plumber involved to cite individually.

Court's finding that Ms. Baughn's deposits were not fully applied to her project is supported by the credible evidence related to the unfinished condition of the project, Mr. Lewis' repeated payment requests that significantly exceeded the initial estimate, substantial project delays, unexplained line-item expenses, and Farmhouse Legacy's employee turnover and severe financial indebtedness.

As a result of the substandard work, inflated charges, and removal of property paid for by Ms. Baughn, Ms. Baughn was forced to pay other contractors to repair her property. Although the new contractors fixed some of the defective work, her home remains uninhabitable, and she currently resides in a recreational vehicle parked on the property.

### Morrison and Parker's Project

Mr. Morrison and Ms. Parker are a married couple. Mr. Morrison is a professional roofer with extensive experience working as a contractor.

Mr. Morrison testified that he first interacted with Mr. Lewis in July 2022, when Mr. Lewis or Farmhouse Legacy constructed a road on an undeveloped parcel in Deer Park, Washington. In late 2023, Mr. Morrison and Ms. Parker approached Mr. Lewis again, this time seeking a contractor to build their retirement home on the same parcel.

On December 20, 2023, Ms. Parker (on behalf of herself and Mr. Morrison) met with Mr. Lewis and signed a project proposal on Farmhouse Legacy's

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 9

letterhead. Under the terms of the proposal, the contractor would "provide all the labor and materials to build [a] new home in [sic] from the ground up." Mr. Morrison, an experienced roofer, would complete the roofing work. Mr. Lewis estimated the project would take between six to nine months with a start date in "March-April" and would "break ground" as soon as weather permitted. Working hours would be "between 7am-5pm," Monday through Friday. Mr. Lewis estimated the project would cost $239,046.31. Like Ms. Baughn's proposal, the Morrison-Parker proposal promised that "[a]bove all else, we will leave you with a home transformation built to elite standards, high quality and integrity."

The same day she signed the project proposal, Ms. Parker delivered a check payable to Farmhouse Legacy for $121,890.36. Banking records revealed the check was deposited on January 3, 2024.

On June 3, 2024, unbeknownst to Morrison and Parker, Farmhouse Legacy was administratively dissolved. Mr. Lewis testified that the dissolution occurred only because the employee who usually handled this detail had left the company. Farmhouse Legacy was not administratively reinstated until January 2025, after Mr. Lewis's relationship with Morrison and Parker had terminated.[6]

---

[6] Mrs. Lewis was no longer listed as a member of Farmhouse Legacy when it was reinstated.

Although the Morrison-Parker proposal provided that the construction would "break ground" as soon as weather permits, or "March-April," construction work did not begin until September of 2024.

On September 10, 2024, Mr. Morrison inquired when Mr. Lewis planned to secure the necessary permit and begin excavation. Mr. Lewis responded that the permitting would be completed soon, and excavation would begin the following week. On September 28, 2024, Mr. Lewis sent photos of the excavation work to Mr. Morrison.

However, Mr. Morrison grew concerned about the project's lack of progress. On September 30, 2024, Mr. Morrison texted Mr. Lewis to report that he had visited the work site and found it unoccupied, stating, "nobody was there." On October 1, 2024, Mr. Morrison texted Mr. Lewis, asking if "we were working today." Mr. Morrison testified that Mr. Lewis responded to his inquiries with a series of excuses rather than substantive answers.

On October 4, 2024, Mr. Morrison texted Mr. Lewis, asking: "Where is our money?" Mr. Lewis replied:

> The money you put down is working for the business and is eagerly waiting for your project. It has been applied to a line of credit and credit cards allowing capacity for the business to continue to build your home. The money is available and ready to go when needed. So far $34,598.94 has been used towards the project in the excavation, permitting and foundation.

Mr. Lewis's reply was untrue; by that date, he had used most of the Morrison-Parker deposit to pay debts that were unrelated to their project. Moreover, Mr. Lewis testified that at the time Farmhouse Legacy received Ms. Parker's check, Farmhouse Legacy's line of credit was maxed out. Even with the debts of Farmhouse Legacy and Mr. Lewis being reduced by the payments from Morrison and Parker, Farmhouse Legacy and Mr. Lewis did not have the financial resources to build the home for Morrison and Parker as promised.

Morrison and Parker terminated their relationship with Mr. Lewis and Farmhouse Legacy shortly afterwards. On October 11, 2024, Mr. Morrison emailed Mr. Lewis to express that he and Ms. Parker were not comfortable with their funds being used to pay down Mr. Lewis's "equity line of credit" or to finance his business. Mr. Morrison requested a refund, which neither he nor Ms. Parker received.

By the time Morrison and Parker terminated the project, Mr. Lewis and Farmhouse Legacy had done little more than dig a hole on the property. Of the $121,890.36 deposit, Mr. Lewis admitted that no more than $34,598.94 had been applied to the Morrison and Parker project, while the remaining balance was diverted and applied to Farmhouse Legacy's existing debts.[7] Given the limited

---

[7] A small portion of the deposit, approximately $8,609.36, was used to pay sales tax.

work performed on the project, Mr. Morrison testified that Mr. Lewis misrepresented how the money was spent. Mr. Morrison's testimony is credible.

At trial, Mr. Morrison testified that he and his wife always understood they were contracting directly with Mr. Lewis, not Farmhouse Legacy. He further stated that he would not have agreed to proceed had he known that the deposit would be used for purposes other than constructing his home.

***Bankruptcy***

The Debtors filed for chapter 13 bankruptcy on April 2, 2025. Debtors' sworn schedules, filed with the petition, list Morrison and Parker, and Ms. Baughn, as unsecured creditors. (ECF No. 1, pp. 23, 25) Specifically, Debtors stated that Morrison and Parker had an unsecured claim of $121,890.36, and Ms. Baughn had an unsecured claim of $40,000.[8] Additionally, Mr. Lewis asserted he was employed as an estimator for ASC Machine Tools Inc, where he claimed to have been employed for one-and-a-half years pre-petition.[9]

On June 2, 2025, Morrison and Parker filed Proof of Claim No. 12-1, alleging $121,890.36 owed for "[c]ash down payment on dream home." Debtors

---

[8] Debtors' Statement of Financial Affairs also denotes Ms. Baughn has a pending state court lawsuit against the Debtors. (ECF No. 1, p. 37) *See Baughn v. Farmhouse Legacy Co, LLC*, Spokane Cnty. Sup. Ct. Case No. 25-2-00655-32.
[9] This assertion places the beginning of Mr. Lewis's employment at ASC Machine Tools Inc. at approximately November of 2023, the same time Farmhouse Legacy agreed to perform work "full-time" for Morrison and Parker, and shortly after Ms. Baughn terminated her relationship with Farmhouse Legacy.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 13

objected to the claim, alleging the debt was Farmhouse Legacy's debt, not the Debtors' personal debt.

On June 3, 2025, Ms. Baughn filed Proof of Claim No. 13-1, alleging $234,000 owed for "[c]ash payments for home renovations + appliances." Debtors objected to the claim, similarly alleging the debt was Farmhouse Legacy's debt, not the Debtors' personal debt.

Morrison and Parker filed an adversary complaint against the Debtors on June 13, 2025, alleging four causes of action: (i) non-dischargeability under § 523(a)(2)(A) for money obtained by false pretenses, a false representation, or actual fraud; (ii) non-dischargeability under § 523(a)(4) for fraud of defalcation while acting in a fiduciary capacity; (iii) non-dischargeability under § 523(a)(6) for willful and malicious injury; and (iv) violations of the Washington Consumer Protection Act, RCW 19.86.020. Ms. Baughn filed an adversary complaint on June 17, 2025, alleging the same four causes of action.

This Court confirmed the Debtors' chapter 13 plan on July 23, 2025. As of the date of this order, the Debtors are current on their plan payments.

The Court held a combined trial on both adversary matters on January 29 and 30, 2026. The Debtors appeared pro se. Farmhouse Legacy was not represented by counsel. At trial, the Court heard testimony from: Mark Connolley,

of the Department of L&I, who had issued citations related to Ms. Baughn's project; Ms. Baughn; Mr. Morrison; Mrs. Lewis; and Mr. Lewis.

### *Piercing the Corporate Veil*

In the State of Washington, piercing the corporate veil or "alter ego" theories are known as "corporate disregard." The question whether the corporate form should be disregarded is a question of fact. *Truckweld Equip. Co. v. Olson*, 26 Wash. App. 638, 643 (1980). Corporate disregard is an equitable remedy, warranted in exceptional circumstances where recognition of the corporate form would aid in perpetrating a fraud or result in a manifest injustice. *Id*.

In determining whether to disregard the corporate form, the reviewing court examines whether (1) the corporate form was intentionally used to violate or evade a duty, and (2) disregard is necessary to prevent unjustified loss to the injured party. *Meisel v. M&N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 410 (1982). However, "the absence of an adequate remedy alone does not establish corporate misconduct." *Id.* at 410–11.

Regarding the first element, intentional violations or evasions of a duty typically involve "fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment." *Id.* (quoting *Truckweld*, 26 Wash. App. at 645).

Regarding the second element, the plaintiff must "show that disregarding the corporate form is necessary to avoid the consequences of intentional misconduct harmful to the plaintiff." *Landstar Inway Inc. v. Samrow*, 181 Wash. App. 109, 123 (2014) (citing *Meisel*, 97 Wn.2d at 410). "This portion of the test for corporate disregard focuses on the nexus between the abuse of the corporate form and the injury the plaintiff claims justifies the disregard of the corporate form." *Id.* at 128.

"[W]here one entity 'so dominates and controls a corporation that such corporation is [the entity's] alter ego, a court is justified in piercing the veil of corporate entity and holding that the corporation and private person are one and the same.'" *In re Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 166 Wash. App. 683, 692 (2012) (quoting *Standard Fire Ins. Co. v. Blakeslee*, 54 Wash. App. 1, 5 (1989)).

<u>*Ms. Baughn Introduced Substantial Evidence that Supports Corporate Disregard.*</u>

Ms. Baughn has established with substantial, credible evidence that Mr. Lewis intentionally used Farmhouse Legacy's corporate form to violate or evade a duty, and disregard of the corporate form is necessary to prevent unjustified loss to Ms. Baughn.

First, Mr. Lewis personally misrepresented his ability to perform work on Ms. Baughn's property, and the misrepresentations caused Ms. Baughn to make deposits on the project. Mr. Lewis made multiple representations to induce Ms.

Baughn to make payments, including that "we are licensed, bonded, and insured for more than the state requires," even though he knew these statements were false. The credible evidence also suggests Mr. Lewis used Ms. Baughn's deposits for purposes unrelated to her project. While Farmhouse Legacy's employees came and went, Mr. Lewis remained Farmhouse Legacy's primary decision-maker and he decided where to spend the money.

Second, Ms. Baughn's injury flows directly from Mr. Lewis's misuse of the corporate form. The evidence reveals that Ms. Baughn's deposits were not fully applied to her project, and that Mr. Lewis used the corporate entity while the corporation was financially distressed to continue accepting customer funds. This case involves more than poor workmanship; Mr. Lewis made intentional misrepresentations, he committed statutory violations, and he overcharged Ms. Baughn without any credible explanation of where her money was spent. By the time Ms. Baughn terminated the project, her funds had dissipated. Without disregarding the corporate form, Ms. Baughn will likely never recover any of the money she gave to Mr. Lewis.

*Morrison and Parker Introduced Substantial Evidence that Supports Corporate Disregard.*

Mr. Morrison and Ms. Parker established with substantial, credible evidence that Mr. Lewis intentionally used Farmhouse Legacy's corporate form to violate or

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 17

evade a duty to them, and disregard of the corporate form is necessary to prevent unjustified loss to Mr. Morrison and Ms. Parker.

First, Mr. Lewis abused the corporate form by misrepresenting how Morrison and Parker's deposit would be used. Morrison and Parker paid $121,890.36 after Mr. Lewis promised their funds would be used to build their home. Specifically, Mr. Lewis told Mr. Morrison: "the money is available and ready to go when needed." However, Mr. Lewis knew at the time he made the statement that it was false and that he intended to use the deposit to pay Farmhouse Legacy's debts unrelated to the Morrison-Parker project. Mr. Lewis remained the primary decision-maker of Farmhouse Legacy and controlled the flow of funds— even while Farmhouse Legacy was administratively dissolved for six months.

Second, Morrison and Parker suffered actual harm from Mr. Lewis's actions because the funds they paid were intended for constructing a house, but Mr. Lewis only managed to dig a hole for the foundation. The majority of the Parker-Morrison money was spent on unrelated debts of Farmhouse Legacy. Absent disregard of the corporate form, Morrison and Parker are unlikely to recover their deposits.

### *Direct Liability under Washington's Consumer Protection Act ("CPA")*

Additionally, Mr. Lewis is personally liable because he violated Washington's Consumer Protection Act ("CPA"), RCW 19.86.020.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 18

Washington's CPA provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful." RCW 19.86.020. The legislature has directed that the CPA "be liberally construed that its beneficial purposes may be served." *Id.*

"If a corporate officer participates in wrongful conduct or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties." *Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 554 (1979) (citing *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 298 (1976)); *see also State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469 (2019) (holding florist personally liable for violating the CPA even though she kept her affairs separate from the corporation and no traditional grounds existed to pierce the corporate veil).

Injured plaintiffs may enforce the CPA. RCW 19.86.080, .090; *see generally Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 316 (2020). To prevail under the Washington CPA, a private plaintiff must establish "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37 (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784 (1986)). "[A] claim under the Washington CPA may be predicated upon a per se violation of statute, an act or

practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787 (2013). A plaintiff alleging injury under the CPA must establish all five elements. *Hangman Ridge*, 105 Wn.2d at 780.

*Ms. Baughn Established Mr. Lewis Violated the Washington CPA.*

First, Mr. Lewis engaged in deceptive practices. Credible evidence introduced at trial revealed Mr. Lewis represented that he was "licensed, bonded, and insured" for an amount "more than" Washington state requires, and that Ms. Baughn's deposit would fund licensed, quality work. Yet, Mr. Lewis personally performed unlicensed and defective plumbing work on Ms. Baughn's property, which resulted in the imposition of infractions.

Second, the deceptive acts and practices occurred in trade or commerce because Mr. Lewis made the misrepresentations in the course of operating a home renovation and construction business.

Third, Mr. Lewis's deceptive acts affect the public interest. The public has an interest in protection from false representations regarding licensure and from substandard or unlicensed construction work.

Fourth, Ms. Baughn suffered significant financial injury. She lost the benefit of her deposits and incurred additional costs for remedial work.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 20

Fifth, Ms. Baughn's injury flows directly from Mr. Lewis's conduct. Mr. Lewis personally made the representations, controlled the project, performed portions of the work, and directed Ms. Baughn's funds to be applied to expenses other than the Baughn project.

Because Mr. Lewis, as a corporate officer of Farmhouse Legacy, participated in wrongful conduct, Mr. Lewis is personally liable for the penalties.

### Mr. Morrison and Ms. Parker Established Mr. Lewis Violated the Washington CPA.

First, Mr. Lewis engaged in deceptive practices. He represented that the deposit from Morrison and Parker would be applied to constructing their retirement home, but instead he used their money to pay unrelated Farmhouse Legacy's debts.

Second, the deceptive acts and practices occurred in trade or commerce because Mr. Lewis made the misrepresentations in the course of operating a home renovation and construction business.

Third, Mr. Lewis' deceptive acts affect the public interest. The public has an interest in protection from false representations regarding licensure and from substandard or unlicensed construction work.

Fourth, Morrison and Parker suffered financial injury. They lost the benefit of their deposit and incurred additional costs to construct the home.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 21

Fifth, the injury suffered by Morrison and Parker flows directly from Mr. Lewis's conduct. Mr. Lewis personally made the representations, controlled the project, performed portions of the work, and directed the Morrison-Parker funds to be applied to expenses other than the Morrison-Parker project.

Because Mr. Lewis, as a corporate officer of Farmhouse Legacy, participated in wrongful conduct, Mr. Lewis is personally liable for the penalties.

### *Non-dischargeability under § 523(a)(2)(A)*

A debt may be non-dischargeable in bankruptcy if it is obtained by false pretenses, false representations, or actual fraud, except if the false statement was "a statement respecting the debtor's financial condition." 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) concerns oral statements. *See* 11 U.S.C. § 523(a)(2)(B) (providing specific elements for materially false written statements).

To prevail on a claim under § 523(a)(2)(A), a creditor must establish five elements: (1) the debtor made representations; (2) that at the time the debtor knew were false; (3) that the debtor made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of

the debtor's misrepresentations. *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

The creditor bears the burden of proving all five of these elements by a preponderance of the evidence. *Id.* To strike a balance between allowing debtors a fresh start and preventing a debtor from retaining the benefits of property obtained by fraudulent means, exceptions to discharge under § 523(a)(2)(A) are construed strictly against creditors and in favor of debtors. *Id.*

*The Debt owed Ms. Baughn is Non-Dischargeable under § 523(a)(2)(A)*

At trial, Ms. Baughn proved by a preponderance of the evidence that the debt owed to her is not dischargeable under § 523(a)(2)(A).

First, Mr. Lewis made false representations to Ms. Baughn that he was licensed to do the work and that he had the current ability to construct a finished, and livable, two-story addition to her home.

Second, at the time Mr. Lewis made the false representations about his licensure and ability to construct the livable, two-story addition, he did not have a plumbing license, nor the necessary resources to complete the Baughn project.

Third, Mr. Lewis misrepresented his licensure and ability to construct a finished, and livable, two-story addition to Ms. Baughn's home because he knew that Ms. Baughn would not give him the money if he lacked the proper licenses and ability to construct the addition.

Fourth, Ms. Baughn's credible testimony demonstrated that she would not have entered into any construction agreement with Mr. Lewis if he had honestly represented his licensure or ability to perform.

Fifth, Ms. Baughn suffered a loss of $172,119.01.[10] She paid Mr. Lewis $172,119.01 for a construction project that was initially estimated to cost $162,150. However, the credible evidence at trial established that Ms. Baughn received no benefit. For example: the plumbing work had to be replaced because parts were installed in the wrong place and some of the drainage pipes, as installed, would have required water to impossibly drain up hill; the roof was installed with holes so it leaked; a window was installed backwards; and faulty drywall work had to be replaced.

*The Debt to Morrison and Parker is Non-Dischargeable under § 523(a)(2)(A).*

At trial, Morrison and Parker proved by a preponderance of the evidence that the debt owed to them is not dischargeable under § 523(a)(2)(A).

First, Mr. Lewis and Mr. Morrison spoke to each other on many occasions about Mr. Lewis building a home for Mr. Morrison and his wife. Through his credible testimony, Mr. Morrison established that Mr. Lewis represented that the money he would receive from Morrison and Parker, which totaled $121,890.36,

---

[10]The amount paid by Ms. Baughn ($172,119.01) is less than her proof of claim ($234,000). At trial Ms. Baughn proved that she received no value from Mr. Lewis' work on her home; however, she did not prove that her nondischargeable damages totaled more than $172,119.01.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 24

would be used for materials and other costs of constructing Morrison and Parker's new home.

Second, Mr. Morrison established through credible testimony and admitted evidence that at the time Mr. Lewis made the misrepresentations, Mr. Lewis was under financial distress. At the time Mr. Lewis accepted the Morrison-Parker money, Mr. Lewis planned to use their money to cover debts that were unrelated to building their home.[11]

Third, the evidence establishes that Mr. Lewis deliberately misrepresented how he would use Morrison and Parker's money because he knew that if he told the truth, Morrison and Parker would not provide him the money.

Fourth, Mr. Morrison's credible testimony demonstrated that Morrison and Parker would not have entered into any construction agreement with Mr. Lewis or Farmhouse Legacy if they had known their money would be used for anything other than building their home.

Fifth, Morrison and Parker suffered a loss of $121,890.36. By the end of their business relationship, the only work performed by Mr. Lewis or Farmhouse

---

[11]Moreover, the evidence revealed that even if the Morrison-Parker money was used for other debts of Mr. Lewis or his company, the cash infusion would not have freed up credit to allow Mr. Lewis to use credit to pay for costs related to the Morrison-Parker construction. After Morrison and Parker paid the money to Mr. Lewis, his business line of credit was still maxed-out.

Legacy was preliminary excavation for a foundation—no rebar was installed, and no concrete was poured; only a hole had been dug.[12]

### *Mrs. Lewis's Separate Estate Liability*

A recent opinion of the United States Supreme Court sets forth the law this Court must follow in determining whether Mr. Lewis's actions result in a separate, nondischargeable debt against Mrs. Lewis. *See Bartenwerfer v. Buckley*, 598 U.S. 69 (2023). *Bartenwerfer* holds that when a debt is created by one spouse's misrepresentations in operating a business, and the second spouse is a partner in the business, that debt is nondischargeable against both spouses pursuant to § 523(a)(2)(A), even where the second spouse did not make the misrepresentations. The Ninth Circuit Bankruptcy Appellate Panel explained the *Bartenwerfer* case: "In sum, *Bartenwerfer* relied on a combination of textual analysis, prior Supreme Court precedent, and the congressional response to that Supreme Court precedent to conclude that § 523(a)(2)(A) rendered nondischargeable a debtor-partner's vicarious liability for another partner's fraud." *In re Del Rosario*, 668 B.R. 618, 626 (9th Cir. BAP 2025).

---

[12]Ms. Baughn, and Morrison and Parker, also argued that §§ 523(a)(4) and (6) are alternative bases for the relief requested. However, since the amount of the plaintiffs' claims are the same under all subsections of § 523(a), and given that the plaintiffs have prevailed under § 523(a)(2)(A), the Court will not opine on the causes of action based on (a)(4) or (6).

In light of *Bartenwerfer*, for Mrs. Lewis to avoid separate liability for Mr. Lewis's misrepresentations, the Court must find that she was not "a partner" in Mr. Lewis's business. The factors a federal court considers in determining the existence of a partnership include: (i) whether the parties have executed a partnership agreement; (ii) whether the parties have represented themselves as co-business-owners, including operating in the name of each family member or filing joint documents regarding business operations; (iii) whether each party is entitled to receive profits and holds responsibility for losses; (iv) whether each party has control over business assets; (v) whether each party contributed financially to the business; (vi) whether each party makes substantial contributions of key services to the business; and (vii) whether the family member receives compensation for those services (including whether the family member receives a salary rather than a share of profits). *See* Theresa J. Pulley Radwan, <u>Till Death Do us Part (NER): Imputed Fraud Liability Concerns for Spouses Following the Supreme Court's Decision in *Bartenwerfer v. Buckley*</u>, 59 Ga. L. Rev. 149, 192 (2024) (citing *Comm'r v. Culbertson*, 337 U.S. 733 (1949)).

Washington state courts use similar factors for determining the existence of a partnership. *See DeFelice v. Emp't Sec. Dep't*, 187 Wash. App. 779, 788–89 (2015) (listing various factors which lend towards a partnership, such as: joint ownership of the business, a joint right of control over the business's affairs, whether a person

receives profit shares outside of employment wages, an express or implied contractual agreement, and sharing losses); *see also* RCW 25.05.055 (discussing partnership formation in Washington).

When reviewing the facts related to the claims of Ms. Baughn and Mr. Morrison and Ms. Parker, this Court concludes that Mrs. Lewis was not a partner in Mr. Lewis's business and thus she has no separate nondischargeable debt.

Primarily, no credible evidence was presented to suggest Mrs. Lewis acted as a business partner. She never executed a partnership agreement with Mr. Lewis regarding Farmhouse Legacy, nor did she act in a way that suggested she had a partnership agreement with Mr. Lewis. The evidence introduced at trial revealed only Mr. Lewis or Farmhouse Legacy employees made representations on behalf of the business. Mrs. Lewis was never an employee of the business. Furthermore, no evidence was presented to indicate Mrs. Lewis directly received profits or had direct personal responsibility for losses of the business.[13] Nor did she have any control over business assets or how customers' money was used or applied to existing debts. No evidence suggested Mrs. Lewis made financial or other

---

[13] The court uses the adverb "directly" when discussing the relevant factors used in determining if Mrs. Lewis was a "partner" in order to distinguish (i) the benefits Mrs. Lewis could possibly receive from being in a marital community with Mr. Lewis and (ii) any possible benefits she could receive separately.

substantial contributions to the business. Finally, Mrs. Lewis did not receive any compensation from the business, nor did she directly receive the profits.

Although both Mr. and Mrs. Lewis were listed as "members" of Farmhouse Legacy, LLC, Mr. Lewis was the only party that acted with disregard for the corporate form and committed CPA violations. None of the evidence presented at trial suggested Mrs. Lewis violated or evaded a duty using Farmhouse Legacy's corporate form, and Mrs. Lewis did not contribute to or amplify any of the losses incurred by Ms. Baughn and/or Mr. Morrison and Ms. Parker.

Without any credible evidence to suggest a business partnership between Mrs. Lewis and Mr. Lewis, Mrs. Lewis cannot be vicariously liable for Mr. Lewis's acts.

## III.   CONCLUSION

The Court will enter judgments in each adversary proceeding consistent with the above memorandum order.[14]

///End of Order///

---

[14] At trial neither plaintiff requested an award of exemplary damages or attorney fees pursuant to the CPA. Accordingly, no such damages or fees will be included in the judgment.

OPINION AND ORDER RE: NON-DISCHARGEABILITY – 29